48 P.3d 485

TRUSTMARK INSURANCE COMPANY, an Illinois corporation, Plaintiff–Appellee, Cross–Appellant,

v.

BANK ONE, ARIZONA, NA, a national banking association, Defendant–Appellant, Cross–Appellee.

No. 1 CA–CV 01–0021.

Court of Appeals of Arizona, Division 1, Department E.

June 18, 2002.

As Corrected June 19 and July 2, 2002.

Atkinson, Hamill & Barrowclough, P.C. By Christopher G. Hamill, Patrick R. Barrowclough, Phoenix, for Plaintiff–Appellee/Cross–Appellant.

Squire, Sanders & Dempsey, L.L.P. By George Brandon Claudia T. Salomon, Phoenix and Bank One Corporation–Law Department By Mary Angela Jenkins, Dallas, TX, for Defendant–Appellant/Cross–Appellee.

## OPINION

GEMMILL, Judge.

¶ 1 If a banking customer sends a bank a letter of instructions requesting wire transfers of funds upon future occurrences of a specified balance condition in the customer's account, does the letter of instructions constitute a "payment order" under Article 4A of Arizona's Uniform Commercial Code ("UCC")?[1] We address this question, and others, in this decision.

¶ 2 Bank One, Arizona, NA ("Bank One") appeals from a jury verdict for Trustmark Insurance Company ("Trustmark") on Trustmark's claim under Article 4A of the UCC and from the trial court's award of attorneys' fees to Trustmark. Trustmark cross-appeals from the jury's determination that Trustmark sustained zero damages on its negligence claim and from the trial court's judgment as a matter of law for Bank One on Trustmark's unjust enrichment claim. We reverse the judgment on the UCC claim and affirm the judgment on the unjust enrichment and negligence claims. We also vacate the court's award of attorneys' fees to Trustmark.

### FACTUAL AND PROCEDURAL BACKGROUND

¶ 3 This case involves a commercial dispute between Bank One and Trustmark over a wire transfer arrangement. In February 1995, Trustmark set up a deposit account ("Account One") at Bank One governed by

---

1. *See* Arizona Revised Statutes ("A.R.S.") §§ 47–4A101 to 47–4A507 (1997). Article 4A of the UCC governs "funds transfers." A.R.S. § 47–4A102 (1997).

Bank One's deposit account rules. At the same time, Trustmark executed a wire transfer agreement with Bank One.

¶ 4 In May 1995, Trustmark sent Bank One a letter (the "Letter of Instructions") regarding a second deposit account ("Account Two"). Account Two was subject to the same deposit account rules and wire transfer agreement as Account One. In the Letter of Instructions, Trustmark instructed Bank One to (1) retain a daily balance of $10,000 in Account Two and (2) transfer funds in Account Two automatically to a Trustmark account at the Harris Bank ("Harris Account") whenever Account Two reached a balance of $110,000 or more. In September 1995, Trustmark's Arizona agent began depositing funds into Account Two. Bank One began transferring funds to the Harris Account whenever the Account Two balance rose above $110,000.

¶ 5 In August 1996, Bank One automated its wire transfer functions and consolidated its local departments into a central wire transfer department. Under the automated process, each account from which wire transfers were anticipated needed a new wire transfer agreement. In preparation, Bank One sent all of its wire transfer customers, including Trustmark, a letter dated July 1, 1996 informing the customers that Bank One required a new funds transfer agreement for each account from which wire transfers were anticipated. The letter stated that if a new funds transfer agreement was not in place by July 19, 1996, Bank One could not ensure uninterrupted wire transfer service from accounts lacking such agreements. Trustmark denies ever receiving this letter and never sent Bank One a new funds transfer agreement for Account Two.

¶ 6 In September 1996, the Account Two balance rose above $110,000 for the first time since the July 19, 1996 deadline. Bank One did not transfer funds from Account Two into the Harris Account. Bank One sent regular account statements to Trustmark showing the balances in Account Two, but received no

further instructions from Trustmark. The Account Two balance continued to grow until December 1997, when Bank One brought the balance to the specific attention of Trustmark's Arizona agent, who contacted Trustmark's management. Bank One transferred $19,220,099.80 to the Harris Account, leaving $10,000 in Account Two. In early 1998, Trustmark instructed Bank One to transfer Account Two's remaining funds to the Harris Account and thereafter closed Account Two.

¶ 7 Trustmark then filed this action against Bank One, alleging a claim under Article 4A of the UCC, as well as claims for unjust enrichment and negligence. Trustmark alleged that Bank One failed to complete wire transfers from Trustmark's non-interest bearing account at Bank One (Account Two) to Trustmark's investment account at Harris Bank (Harris Account), contrary to the Letter of Instructions. Trustmark asserted a loss of more than $500,000 in interest on its funds as a result of Bank One's inaction, and that Bank One reaped a corresponding windfall profit through interest Bank One earned on Trustmark's money. Trustmark did not assert a breach of contract claim. According to Bank One, the contractual documents eliminated recovery or significantly limited the amount recoverable for breach of contract. However, Article 4A—if applicable— restricts the right of a bank to limit its liability regarding funds transfers. *See* A.R.S. § 47–4A305(F) (1997).[2]

¶ 8 Bank One filed motions to dismiss and for summary judgment on the UCC claim, arguing that the wire transfers at issue were not subject to Article 4A because the Letter of Instructions was not a "payment order" under Article 4A. The trial court denied Bank One's motions, and the case proceeded to a jury trial. At the close of evidence, the court granted Bank One's motion for judgment as a matter of law on the unjust enrichment claim, but continued to reject Bank One's argument that Article 4A of the UCC was not applicable. The court submitted

2. Section 47–4A305 specifies the liability of a bank under UCC Article 4A for late or improper execution of, or failure to execute, a payment order. *See* A.R.S. § 47–4A305(A), (B), and (D).

Trustmark sought recovery under A.R.S. §§ 47–4A305 and 47–4A506 (1997). Bank One argued these provisions were not applicable.

Trustmark's UCC claim and its negligence claim to the jury.

¶ 9 The jury returned a verdict for Trustmark on the UCC claim and found damages of $573,197.02. On the negligence claim, the jury chose the verdict form that recited a finding in favor of Trustmark, but the jury's verdict form indicated that the parties were each 50% at fault and the damages were $0. The trial court entered judgment for Trustmark with damages of $573,197.02, as well as pre-judgment interest, attorneys' fees, and taxable costs.

## ISSUES ON APPEAL AND CROSS APPEAL

¶ 10 Bank One argues on appeal that Trustmark's judgment should be reversed as a matter of law because Article 4A of the UCC is not applicable. According to Bank One, the Letter of Instructions was not a "payment order" under Article 4A, and the trial court should not have sent this UCC claim to the jury.

¶ 11 Trustmark argues on cross-appeal that if the judgment on its UCC claim is reversed or remanded, then its unjust enrichment claim should be reinstated. Trustmark also seeks a new trial on its negligence claim, arguing that the jury's finding of $0 damages proves that the jury was confused and failed to enter a verdict in conformity with the jury instructions and Arizona law.

## BANK ONE'S APPEAL

¶ 12 Bank One challenges the trial court's submission of the UCC claim to the jury on the basis that the Letter of Instructions is not a "payment order" under Article 4A; therefore the UCC is not applicable, and this claim should have been dismissed as a matter of law. Whether the Letter of Instructions is a "payment order" is initially a question of law that we independently review. *Phoenix Newspapers, Inc. v. Ariz. Dep't of Econ. Sec.*, 186 Ariz. 446, 448, 924 P.2d 450, 452 (1996).

## As a Matter of Law, the UCC Does Not Apply Because the Letter of Instructions Was Not a "Payment Order" Under Article 4A

¶ 13 We begin our analysis of the applicability of Article 4A by noting its recent origin and its purpose. In 1989 the National Conference of Commissioners on Uniform State Laws and the American Law Institute promulgated Article 4A of the UCC, addressing funds transfers. Over the next several years, all fifty states and the District of Columbia enacted Article 4A as part of their existing UCC statutes. Arizona enacted Article 4A in 1991.

¶ 14 Technological developments in recent decades have enabled banks to transfer funds electronically, without physical delivery of paper instruments. Before Article 4A, no comprehensive body of law had defined the rights and obligations that arise from wire transfers. Article 4A was intended to provide a new and controlling body of law for those wire transfers within its scope. "The drafters' aim was to achieve national uniformity, speed, efficiency, certainty, and finality in the funds transfer system." *Grabowski v. Bank of Boston*, 997 F.Supp. 111, 121 (D.Mass.1997) (citing *Banque Worms v. BankAmerica Int'l*, 77 N.Y.2d 362, 568 N.Y.S.2d 541, 570 N.E.2d 189, 195 (1991)).

¶ 15 Because there are very few reported decisions—and none from Arizona—interpreting and applying the provisions of Article 4A defining its scope, we have considered primarily the language of the pertinent statutes, the purpose of Article 4A, and the comments of its drafters. In the Prefatory Note to Article 4A, the drafters discussed the funds transfers intended to be covered and several factors considered in the drafting process:

> There are a number of characteristics of funds transfers covered by Article 4A that have influenced the drafting of the statute. The typical funds transfer involves a large amount of money. Multimillion dollar transactions are commonplace. The originator of the transfer and the beneficiary are typically sophisticated business or financial organizations.[3] High speed is an-

---

**3.** The originator and beneficiary may be the same person or entity. *Grabowski,* 997 F.Supp. at 121.

other predominant characteristic. Most funds transfers are completed on the same day, even in complex transactions in which there are several intermediary banks in the transmission chain. A funds transfer is a highly efficient substitute for payments made by the delivery of paper instruments. Another characteristic is extremely low cost. A transfer that involves many millions of dollars can be made for a price of a few dollars. Price does not normally vary very much or at all with the amount of the transfer. This system of pricing may not be feasible if the bank is exposed to very large liabilities in connection with the transaction.

Prefatory Notes to UCC Article 4A, "Characteristics of a funds transfer," 2B U.L.A. 458 (1991) (footnote added).

¶ 16 Article 4A applies only to "funds transfers" as defined in the statute. A.R.S. § 47–4A102 (1997). A "funds transfer" is "the series of transactions, beginning with the originator's *payment order*, made for the purpose of making payment to the beneficiary of the order." A.R.S. § 47–4A104(1) (1997) (emphasis added). Accordingly, to fall within the scope of Article 4A, a transaction must begin with a "payment order."

¶ 17 A "payment order" is defined by the UCC, in pertinent part, as:

[A]n instruction of a sender to a receiving bank, transmitted orally, electronically, or in writing, to pay, or to cause another bank to pay, a *fixed or determinable amount of money* to a beneficiary if:

(a) *The instruction does not state a condition to payment* to the beneficiary *other than time of payment.* . . .

A.R.S. § 47–4A103(A)(1) (1997) (emphasis added). A recent law review article explains:

By definition, an Article 4A payment order must be unconditional. Therefore, an important scope issue in determining whether Article 4A applies is whether the payment order in question is or is not conditional.

---

4. Because we base our resolution on the definition of "payment order," we do not reach Bank One's argument that the Letter of Instructions

---

Alvin C. Harrell, *UCC Article 4A*, 25 Okla. City U.L.Rev. 293 (2000) (footnote omitted).

¶ 18 Bank One argues that the Letter of Instructions was not a payment order, because the Letter was not for a "fixed or determinable amount of money" and imposed two conditions other than time of payment: that the account balance always remain $10,000 ("balance condition") and that transfers not occur until subsequent deposits have raised the balance to $110,000 or more ("deposit condition").[4] Trustmark argues that the conditions at issue were merely conditions regarding the time of payment—that the balance and deposit conditions essentially determined when transfers were to be made. Trustmark asserts that time of payment need not be set by a specific date, but may be set by events such as the bank's receipt of an incoming wire or deposit. However, the amounts to be transferred did not relate to incoming wires for the same amounts or even wires received on the same day of each month. Rather, Trustmark's agent made deposits sporadically and in varying amounts. Therefore, the conditions in the Letter of Instructions required Bank One to continuously monitor Trustmark's account balance to determine whether sufficient deposits had been made to enable the bank to make a transfer that satisfied both the deposit and balance conditions.

¶ 19 Neither party has cited, nor has our own research revealed, any reported decision addressing the precise issue presented: whether a letter of instructions from an account holder to its bank, requesting automatic wire transfers of funds in excess of a minimum balance whenever the total balance equals or exceeds a specified amount, constitutes a "payment order" governed by UCC Article 4A. We conclude that the Letter of Instructions was not a "payment order," because the Letter subjected Bank One to a condition to payment other than the time of payment.

¶ 20 Article 4A applies to discrete, mechanical transfers of funds. Comment 3 to UCC § 4A–104 (A.R.S. § 47–4A104) provides:

---

was not for a "fixed or determinable amount of money."

The function of banks in a funds transfer under Article 4A is comparable to their role in the collection and payment of checks in that it is essentially mechanical in nature. The low price and high speed that characterize funds transfers reflect this fact. Conditions to payment ... other than time of payment impose responsibilities on [the] bank that go beyond those in Article 4A funds transfers.

*See also Centre–Point Merchant Bank v. Am. Express Bank,* 913 F.Supp. 202, 208 (S.D.N.Y.1996) (payment orders under Article 4A are not intended to require banks to "engag[e] in inquiries as to whether conditions have been satisfied.").

¶ 21 Bank One's obligation to make an ongoing inquiry as to Account Two's balance status removes the Letter of Instructions from the Article 4A definition of a "payment order." A.R.S. § 47–4A103(A)(1)(a); Comment 3 to UCC § 4A–104 (A.R.S. § 47–4A104), (quoted in ¶ 20, *supra* ). Conditions other than time of payment "are anathema to [A]rticle 4A, which facilitates the low price, high speed, and mechanical nature of funds transfers." *Grabowski,* 997 F.Supp. at 121 (citing Mass. Gen. L. ch. 106, § 4A–104, cmt. 3). In their treatise on the UCC, James J. White and Robert S. Summers further explain:

> A payment order must not "state a condition to payment of the beneficiary other than time of payment." Few transactions will include such conditions. The exception for "time of payment" means that a payment order need not order immediate payment, though most do. For example, a payment order may specify that a certain amount of money must be paid on a certain date to a particular beneficiary.

3. James J. White & Robert S. Summers, *Uniform Commercial Code* § 22–2 (4th ed.1995) (citation omitted). White and Summers then quoted the same language from Comment 3 that we quote in ¶ 20 to explain that "the drafters did not wish to involve banks in [inquiries] into whether other conditions have occurred." *Id.*

¶ 22 Based on the language defining "payment order," the purpose of Article 4A, and the drafters' intent that payment orders be virtually unconditional, we conclude that requiring the bank to continually examine the account balance is a condition to payment other than time of payment under A.R.S. § 47–4A103(A)(1)(a). We perceive a qualitative difference between a condition requiring daily monitoring of the account balance and an instruction to wire funds on a specific day.

■ ¶ 23 Trustmark also argues that the balance and deposit conditions were permissible conditions observed by Bank One in the past, and therefore Bank One cannot now argue that the conditions were impermissible under Article 4A. The fact that Bank One provided these services to Trustmark under the wire transfer agreement and the Letter of Instructions does not alter our analysis and is irrelevant to whether the Letter of Instructions falls within the definition of a "payment order." Bank One does not argue that such conditions are impermissible *per se;* Bank One simply argues that the Letter's conditions are beyond the permissible conditions for an Article 4A "payment order." Although parties may appropriately and legitimately make such a long-term arrangement for transfers to and from various accounts, their agreement does not automatically transform the arrangement into an Article 4A funds transfer.

### The Trial Court Erred by Submitting the UCC Claim to the Jury Because the UCC Claim Involved No Questions of Fact, Only a Question of Law

■ ¶ 24 Trustmark further argues that whether the Letter of Instructions is a "payment order" is a question of fact that was properly submitted to the jury. However, the content of the Letter of Instructions is not in dispute. Whether the document constitutes a "payment order" is a matter of statutory interpretation, which is a legal issue for the court, not the finder of fact. *See Phoenix Newspapers,* 186 Ariz. at 448, 924 P.2d at 452.

¶ 25 Trustmark relies on several cases holding that issues of UCC interpretation present questions of fact. *See, e.g., Day v. Schenectady Discount Corp.,* 125 Ariz. 564, 611 P.2d 568 (App.1980); *Gulf Homes, Inc. v.*

*Goubeaux,* 124 Ariz. 142, 602 P.2d 810 (1979). These cases are inapposite as they involved factual disputes regarding questions of reasonableness, the determination of which depends upon the circumstances. *Day,* 125 Ariz. at 569, 611 P.2d at 573 (numerous questions regarding sending of notice made reasonableness of notice appropriate for trier of fact); *Gulf Homes,* 124 Ariz. at 144, 602 P.2d at 812 (because UCC contains no definition of "commercially reasonable," determination of same depends upon circumstances and is question of fact). While determinations of reasonableness are usually questions of fact, this case presents no factual dispute or issue of reasonableness requiring fact-finding by a jury.

¶ 26 In contrast to *Gulf Homes,* involving the absence of a definition of "commercially reasonable," the scope of Article 4A is determined by the definitions of 'payment order' and 'funds transfer.' *See* ¶¶ 16–17, *supra. See also* White & Summers, *Uniform Commercial Code* § 22–2 ("In truth the scope provision in Article 4A *is* the definition of payment order, set out in 4A–103(a)(1).").

¶ 27 Trustmark contends that the UCC fails to define or interpret various words within the definition of "payment order," such as "determinable" and "condition," and therefore whether an instruction states a "condition" should be decided by a trier of fact. However, the absence of a definition does not automatically create a question of fact. Rather, in applying a statute, courts give words their ordinary meaning, unless a specific definition is given or the context clearly indicates that a special meaning was intended. *See, e.g., Southwest Airlines v. Ariz. Dep't of Rev.,* 197 Ariz. 475, 477, ¶ 6, 4 P.3d 1018, 1020 (App.2000) ("Because the legislature did not define that word, we will find and apply the common meaning of that word...."); *Mid Kansas Fed. Sav. and Loan Ass'n of Wichita v. Dynamic Dev. Corp.,* 167 Ariz. 122, 128, 804 P.2d 1310, 1316 (1991) (same). Because the content of the Letter of Instructions is undisputed and only its legal significance is contested, whether that document constitutes a "payment order"

under Article 4A is a question of law for the court. *Phoenix Newspapers,* 186 Ariz. at 448, 924 P.2d at 452.

¶ 28 We conclude, as a matter of law, that Trustmark does not have a claim under UCC Article 4A, because the Letter of Instructions is not an Article 4A "payment order." Therefore, we reverse the judgment against Bank One on Trustmark's UCC claim.

¶ 29 The trial court awarded attorneys' fees to Trustmark. Because we have reversed judgment for Trustmark on its UCC claim, the award of fees is no longer appropriate, and we vacate the award of attorneys' fees.

## TRUSTMARK'S CROSS–APPEAL

**The Trial Court Properly Granted Bank One's Motion for Judgment as a Matter of Law on Trustmark's Unjust Enrichment Claim**

¶ 30 Trustmark challenges the adverse judgment on its unjust enrichment claim. The court granted Bank One judgment as a matter of law ("JMOL") on that claim at the close of all the evidence. We independently review a trial court's grant of JMOL and view all reasonable inferences from the evidence in favor of the party opposing judgment. *Monaco v. HealthPartners of S. Ariz.,* 196 Ariz. 299, 302, ¶ 6, 995 P.2d 735, 738 (App.1999).

¶ 31 Unjust enrichment occurs when one party has and retains money or benefits that in justice and equity belong to another. *City of Sierra Vista v. Cochise Enter., Inc.,* 144 Ariz. 375, 381, 697 P.2d 1125, 1131 (App.1984). To establish a claim for unjust enrichment, a party must show: (1) an enrichment; (2) an impoverishment; (3) a connection between the enrichment and the impoverishment; (4) the absence of justification for the enrichment and the impoverishment; and (5) the absence of a legal remedy. *Id.*

¶ 32 Trustmark contends that the trial court believed that Trustmark had an adequate remedy[5] based on the UCC and for

5. Although Trustmark framed the issue using the

terminology of an "adequate" remedy at law, a

that reason granted the motion for JMOL on the unjust enrichment claim. Trustmark therefore asserts that given our reversal of the judgment on the UCC claim, we must reinstate the unjust enrichment claim. However, the trial court never justified the grant of JMOL based on a conclusion that the UCC claim supplied Trustmark with a remedy at law. Rather, at the close of Trustmark's case, the judge indicated that he was inclined to grant the motion because he had not "heard any real evidence on [the unjust enrichment] claim . . . ." and he did not "think this [was] an unjust enrichment case." When granting the motion at the close of all the evidence, the judge gave no further reasons for his ruling.

¶ 33 Although Bank One argued that JMOL on the unjust enrichment claim was proper because Trustmark had a remedy at law, the remedy Bank One referred to was a breach of contract action based on the contractual documents governing the account, not the UCC claim.[6] Furthermore, Bank One always contended that the UCC did not apply because the Letter of Instructions was not a "payment order." Accordingly, we find no basis for assuming the trial court's dismissal of the unjust enrichment claim was tied to its allowance of the UCC claim.

■ ¶ 34 As our supreme court has explained in *Brooks v. Valley Nat'l Bank*, 113 Ariz. 169, 548 P.2d 1166 (1976), if there is "a specific contract which governs the relationship of the parties, the doctrine of unjust enrichment has no application." 113 Ariz. at 174, 548 P.2d at 1171. *See also Johnson v. Am. Nat'l Ins. Co.*, 126 Ariz. 219, 223, 613 P.2d 1275, 1279 (App.1980). Here, Trustmark could have pursued a breach of contract claim based on the contractual documents applicable to Account Two. Because these contractual documents governed the relationship of the parties, the trial court properly granted Bank One's motion for JMOL on Trustmark's unjust enrichment claim.

¶ 35 Trustmark argues that Bank One cannot point to the wire transfer agreement as a basis for a contractual remedy because the bank has argued that the wire transfer agreement was no longer in effect after July 1996. This argument is not persuasive because it focuses on whether a particular document continued to be applicable between the parties, rather than on the existence of a contractual relationship that can be evaluated in a breach of contract action. If Bank One, under whatever contractual documents might be found to be in force and effect, was contractually obligated to make the wire transfers, then Trustmark has (or had) a breach of contract remedy.[7] If Bank One was not obligated to transfer funds from the account, any perceived "enrichment" was not unjust. *See Johnson*, 126 Ariz. at 223, 613 P.2d at 1279.

¶ 36 Finally, Trustmark relies on *Adelman v. Christy*, 90 F.Supp.2d 1034 (D.Ariz.2000), for the proposition that it may pursue an unjust enrichment claim even if it had a legal remedy in the form of a breach of contract claim. However, we find *Adelman* to be distinguishable. In *Adelman*, the plaintiff sought to recover for research services she had provided the defendant author and publisher of a book. 90 F.Supp.2d at 1036. The *Adelman* court concluded that the plaintiff could pursue an unjust enrichment claim as an alternative theory of recovery in conjunction with her breach of contract claim, subject to only one recovery. *Id.* at 1045–46. The court held that allowing the alternative theory of recovery was appropriate in case the contract was found invalid or the plaintiff

party's right to seek unjust enrichment is not controlled by whether the party has an "adequate" remedy at law—in the sense of providing all the relief the party desires—but by whether there is a contract which governs the relationship between the parties. *See* ¶ 34, *infra.*

6. Bank One also argued that JMOL was proper on the unjust enrichment claim because Trustmark could not establish "absence of justification for the enrichment," in that Bank One's failure

to transfer funds was justified by Trustmark's failure to provide a new funds transfer agreement and lack of diligence in monitoring its bank statements and notices of deposit for Account Two.

7. The record reveals that one or more of at least three documents may have been applicable: the deposit account rules, the wire transfer agreement, and the Letter of Instructions.

was deemed the breaching party, in which case the plaintiff would not have a remedy at law to recover payment for the services she had rendered. *Id.* at 1045, n. 10.

¶ 37 Trustmark is not seeking to pursue its unjust enrichment claim in the alternative; rather, it seeks to avoid possible contractual limitations on its recovery by resorting to an unjust enrichment cause of action. *Brooks* is more on point here than *Adelman* and is controlling. *See also Johnson,* 126 Ariz. at 223, 613 P.2d at 1279 (unjust enrichment not allowed when appellants were seeking to relieve themselves of effects of express contract). The trial court properly granted Bank One JMOL on the unjust enrichment claim.

### Trustmark Waived Any Objection to the Jury Verdict on Its Negligence Claim

 ¶ 38 Trustmark seeks a new trial on its negligence claim. The jury chose the negligence form of verdict that recited a finding in favor of Trustmark, but then fixed the damages at $0 and found the parties each 50% at fault. Trustmark asserts that on the face of the verdict, the jury was clearly confused and the verdict is contrary to the law. The jury could not have found in favor of Trustmark on its negligence claim given the jury's finding of zero damages, because actual damages are an essential element of that claim. We conclude that Trustmark waived this issue by not objecting to the jury verdict when rendered. *Gonzalez v. Gonzalez,* 181 Ariz. 32, 35–36, 887 P.2d 562, 565–66 (App. 1994). *Cf. Evans by Beemer v. Ariz. Dep't of Corr.,* 139 Ariz. 321, 322, 678 P.2d 506, 507 (App.1983) (parties may not raise on appeal issues not raised in trial court).

¶ 39 If Trustmark believed the jury verdict was inconsistent, defective, or nonresponsive to its negligence claim, Trustmark should have moved, before the jury was excused, for resubmission of the case to the jury pursuant to Rule 49(c), Arizona Rules of Civil Procedure. Under that rule, the court is required to call the jury's attention to the inconsisten-

cy in the verdict and send the jury to further deliberate. Ariz. R. Civ. P. 49(c); [8] *see Walter v. Simmons,* 169 Ariz. 229, 234, 818 P.2d 214, 219 (App.1991) (appropriate for trial court to resubmit verdicts to jury to reconsider pertinent instructions when verdicts were potentially inconsistent). However, Trustmark did not invoke Rule 49(c). By not challenging the verdict when rendered, Trustmark waived its objection to any error. *Gonzalez,* 181 Ariz. at 35–36, 887 P.2d at 565–66 (plaintiffs' failure to invoke Rule 49(c) at time jury rendered verdict constitutes waiver of argument that verdict is inconsistent); *see also Farmers Ins. Co. v. Tallsalt,* 191 Ariz. 177, 180, 953 P.2d 921, 924 (App. 1997) (defendant waived argument that verdict was not responsive because of its silence regarding the counterclaim when verdict received), *vacated in part on other grounds,* 192 Ariz. 129, 962 P.2d 203 (1998).

¶ 40 Requiring the party to object to defective verdicts at trial provides the court with an opportunity to correct the error with minimal effort and expense, and aids " 'the just and efficient operation of the ... courts.' " *Gonzalez,* 181 Ariz. at 36, 887 P.2d at 566 (quoting *Cundiff v. Washburn,* 393 F.2d 505, 507 (7th Cir.1968)). A contrary rule would create additional burdens for the courts and " 'encourage jury-shopping by litigants, permitting them to decide whether to take their chances on resubmitting the verdict and findings to the jury sitting or remain silent thereby allowing the entry of judgment and moving for a new trial before a new jury.' " *Id.*

 ¶ 41 Trustmark argues that the *Gonzalez* and *Farmers* cases are distinguishable as the parties in those cases failed to object to the inconsistent verdicts as part of an apparent "wait and see" strategy, because an objection in those cases might have led to a less beneficial verdict. Trustmark denies any "jury-shopping" motive and denies remaining silent as part of a strategy to avoid any risk. Trustmark suggests that the negligence verdict could not become worse from its perspective because the jury awarded $0 damages, and the favorable UCC verdict

---

**8.** The pertinent portion of Rule 49(c) is: "If the verdict is not responsive to the issue submitted to the jury, the court shall call the jurors' attention thereto, and send them back for further deliberation."

would not be affected by any alteration to the negligence verdict. However, even if Trustmark had no grand strategy at work here, we note that when a court receives an inconsistent verdict and resubmits the case to the jury for further deliberations, the entire case remains in the hands of the jury. *Gomez v. Tucson Yellow Cab Co.,* 127 Ariz. 563, 565, 622 P.2d 510, 512 (App.1980). Here, the jury upon resubmission could have chosen the negligence verdict form finding in favor of Bank One and even could have changed its mind on liability or damages under the UCC claim.

¶ 42 Trustmark's timely objection could have enabled the trial court and the jury to rectify the problem and avoid any need for a new trial. This case is not akin to *Berry v. McLeod,* 124 Ariz. 346, 604 P.2d 610 (1979), in which the parties recognized that the verdicts were hopelessly inconsistent and therefore concluded that sending the verdicts back to the jury for further deliberations would be futile. 124 Ariz. at 350, 604 P.2d at 614. Here, although the negligence verdict contained a clear inconsistency, this inconsistency may have been readily corrected by further deliberations. By failing to make the objection and waiting until appeal to seek a new trial on the issue, Trustmark has taken an approach that would, if upheld, impose great expense on the parties as well as additional and potentially unnecessary expense and burden on the courts. We therefore conclude Trustmark waived any objection to the verdict by not objecting below.[9] *Gonzalez,* 181 Ariz. at 35, 887 P.2d at 565.

## CONCLUSION

¶ 43 We reverse the judgment in favor of Trustmark on the UCC claim and vacate the award of attorneys' fees to Trustmark. We affirm the judgment in all other respects.

CONCURRING: MICHAEL D. RYAN, Presiding Judge and DANIEL A. BARKER, Judge.

---

9. Because of this waiver, we need not reach the question whether the "economic loss" doctrine

would bar a negligence recovery in favor of Trustmark.